# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7208 | **DATE** | 10/30/2001 |
| **CASE TITLE** | | Degenova vs. Sheriff of DuPage County, et al. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants defendant Bertuca's and defendant Sheriff's motions for summary judgment [#44, 46], and declines to rule on defendant Stahurski's motion for summary judgment [#42], instead dismissing the pendent state law claims against him pursuant to 28 U.S.C. § 1367(c)(3).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 31 2001 date docketed | 59 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. Mailed by md. | | mu docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 10/30/2001 date mailed notice | |
| MD | courtroom deputy's initials | FOR DOCKETING 01 OCT 30 PM 4: 52 | MD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

MARIO DEGENOVA )
)
Plaintiff, )
)
v. ) No. 97 C 7208
)
SHERIFF OF DUPAGE COUNTY, DEPUTY )
SHERIFF BURTUCCA, and ROBERT J. )
STAHURSKI, )
)
Defendants. )

**DOCKETED**

OCT 3 1 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff's amended complaint alleges liability against the Sheriff of DuPage County ("the

Sheriff") and Deputy Sheriff Bertuca ("Bertuca")[1] under 42 U.S.C. § 1983 and against Robert

Stahurski ("Stahurski") under Illinois law stemming from plaintiff's arrest, transport to, and

detention at the DuPage County Jail from the evening of October 16 to October 17, 1996.

Defendants have moved for summary judgment. The court has jurisdiction over plaintiff's

§ 1983 claims pursuant to 28 U.S.C. § 1343. For the reasons set forth herein, the court grants

summary judgment to the Sheriff and Bertuca and declines to exercise supplemental jurisdiction

over the state law claims against Stahurski.

### SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

---

[1] Although plaintiff spelled defendant's name "Burtucca" in the complaint, the parties have spelled defendant's name as "Bertuca" throughout their briefs.

1

56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

Plaintiff is a 48-year old man who takes medication at 9:00 a.m. and 9:00 p.m. everyday for his heart condition. According to plaintiff, he first began to experience symptoms in June, 1996, when he was at work unloading a truck and he began to feel nauseated and dizzy, started to sweat and then collapsed. He went to the emergency room and a few days later saw a cardiologist who performed extensive tests on him. Plaintiff states that was diagnosed as having

"vasodepressor syncope," which appears as a fainting spell, is "triggered by stress" and is caused by "a wiring problem between the heart and the brain."[2]

On or about October 1, 1996, Stahurski, who lived across the street from plaintiff, complained to the DuPage County Sheriff's Office ("Sheriff's Office") about damage to his property. The Sheriff's Office dispatched Bertuca to Stahurski's residence. When Bertuca arrived, Stahurski told him that sometime between five and six o'clock in the morning, he saw plaintiff drive his car across the grass. Stahurski pointed to ruts in the lawn about four feet from the paved public roadway in front of his house, and Bertuca observed the tire track damage. Bertuca then spoke with plaintiff who denied he had damaged Stahurski's lawn but stated that, previously, Stahurski had damaged his lawn and he (plaintiff) did not report the incident to the police. Bertuca asked Stahurski whether he wanted to sign a complaint. Stahurski indicated that he did, and Bertuca arranged to meet Stahurski at the DuPage County courthouse. Bertuca drafted a criminal complaint, which stated that plaintiff, in violation of 720 ILCS 5/21-1(1)(a), "knowingly damaged property of Robert J. Stahurski, the lawn in front of the residence located at 20W049 98th St." Stahurski signed the complaint on October 2, 1996, under oath and in the presence of a judge. The judge found probable cause to arrest plaintiff, issued a warrant, and set bail on the warrant. The arrest warrant was subsequently turned over to county jail personnel for

---

[2]There is no admissible evidence in the record as to plaintiff's diagnosis or the exact nature of his condition. Plaintiff merely referred to his own deposition testimony as evidence of his diagnosis and the causes of his condition. (*See* Pl.'s Additional Facts ¶¶ 2c.-d. (citing DeGenova Dep. at 13, 23)). However, a diagnosis may only be established through the relevant doctor's records pursuant to Fed. R. Evid. 803(6) or the sworn testimony of the doctor, *see Holt* v. *Olmsted Township Bd. of Trustees*, 43 F. Supp. 2d 812, 819 (N.D. Ohio 1998), and testimony as to the cause of a particular medical condition must be established by expert testimony. Fed. R. Evid.702. *See Minor* v. *Ivy Tech State College*, 174 F.3d 855, 856-57 (7th Cir. 1999) (inadmissible hearsay is "unusable in summary judgment proceedings without a showing not attempted here that it could readily be replaced at trial by admissible evidence") (citations omitted).

processing. Some time on October 2, 1996, Bertuca had a phone conversation with plaintiff in which plaintiff told Bertuca about his heart condition.

Approximately two weeks later, on October 16, 1996, at 8:30 p.m., after checking whether the warrant was still active, Bertuca went with another deputy to execute the warrant. The deputies repeatedly knocked on plaintiff's door but there was no answer. Bertuca had a dispatcher phone plaintiff, and the dispatcher relayed to Bertuca that plaintiff did not want to speak with him. Bertuca asked the dispatcher to explain to plaintiff that it was important that Bertuca talk to him. A short time later, plaintiff came to the door. According to plaintiff, Bertuca pushed his way inside and informed plaintiff that he had a warrant for his arrest. Plaintiff became visibly upset. Plaintiff asked whether he could bring his medication with him because he had to take it at 9:00 p.m. and Bertuca said he could. Bertuca followed plaintiff to the basement where plaintiff retrieved individual pills from prescription bottles and put the pills in his shirt pocket. Bertuca then handcuffed plaintiff with his hands in front and placed him in the squad car for transportation to the DuPage County Jail ("the jail").

Bertuca testified that, while traveling to the jail, plaintiff continued to appear upset, was swearing and threatened to file lawsuits against Bertuca and the Sheriff's Office. Plaintiff admits, while in the car, he told Bertuca, "You are going to be talking to my lawyer about this." (DeGenova Dep. at 58.) Plaintiff asserts, however, that shortly after being placed in the squad car, he became nauseated, began to have trouble breathing and then blacked out. (*Id.* at 64.) Observing plaintiff lying across the back seat of the squad car, Bertuca contacted a dispatcher to say that he was stopping to check plaintiff's condition. Bertuca checked plaintiff's pulse rate, breathing and color and determined that there was nothing wrong. He attempted to speak to

plaintiff, but plaintiff did not respond. Plaintiff's daughter Diane and her boyfriend, who had been following behind in order to post bond for plaintiff, also pulled over. Bertuca told Diane that he stopped to check on her father and permitted Diane to speak with plaintiff. Diane then began to yell at Bertuca "to take her father to a doctor." An argument ensued and Bertuca radioed his supervisor, advised him of the situation and asked for backup. Bertuca proceeded to the jail. He also radioed jail personnel and advised them that he would be arriving with a subject lying across the back seat. At the time, it was Bertuca's belief that plaintiff was being uncooperative. When Bertuca arrived at the jail at approximately 9:10 p.m., plaintiff was still lying down and several correctional officers, a nurse paramedic and medical staff came out to meet them.

During the jail's intake and booking process, correctional officers are required to notify medical staff at the jail of any inmate who complains of any medical/psychiatric problems or potential problems. The medical staff at the jail are employed by Correctional Medical Services of Illinois, Inc. ("CMS"), which has an agreement with DuPage County under which CMS provides medical care services for those incarcerated at the jail. Once CMS medical staff responds to the correctional officer's request, the medical staff takes over the care and treatment of the inmate. At the request of a correctional officer, Julianne Adighibe, LPN ("Nurse Adighibe"), a CMS nurse, assessed plaintiff in the jail vestibule (the outside sally port area). She testified that after speaking to him and checking his vital signs, she determined that he was medically acceptable for admission to the jail.

Plaintiff asserts that after Bertuca turned him over to jail personnel, he was roughly pulled from the car and was unable to speak because he was having trouble breathing. He testified that

a nurse tried to take his blood pressure while he was on the floor on his back with officers standing on his legs and arms, but that the nurse was unable to get a reading. Jail personnel searched plaintiff, found the two individual pills he had brought with him in his shirt pocket, and took the pills from him. Plaintiff testified that jail personnel made rude comments about his medical needs, and then dragged him to a cell, where he was kicked and his clothes removed. At some point during his detention at the jail, plaintiff's family was attempting to post bond, but jail officials refused to accept bond. Plaintiff's daughter testified that although she had been told by Bertuca that her father would be out in "a little while," when she spoke to the officer at the jail, he related to her that her father was being uncooperative, and they were going to have to hold him. (Diane DeGenova Dep. at 58.)

At 10:00 p.m., Nurse Adighibe again checked plaintiff's vital signs. She testified that she placed plaintiff on a 15-minute suicide watch because he refused to answer questions, and states that at no time did he raise any medical complaints to her. She did learn, however, from correctional officers that plaintiff brought two different types of pills with him to the jail without the prescription bottles. She later learned from plaintiff's wife that the two pills were medications to treat high blood pressure, and also learned from plaintiff's wife that plaintiff may have been drinking alcohol earlier that evening. Nurse Adighibe testified that when she evaluated plaintiff at 10:00 p.m., he did not require any immediate medical care from a physician nor did he require transfer to a hospital. She further testified that if she had felt that he required immediate medical care, then she had the authority to call a physician for orders or to send him to the hospital. As a precautionary measure, she scheduled plaintiff to see Dr. Oberhelman, CMS's

6

medical doctor, and Dr. O'Riordan, CMS's psychologist, the following morning. The Jail

Intervention Notes dated October 16, 1996, 10:00 p.m., signed by Nurse Adighibe state:

> Inmate seen in MCC vestibule on the floor. Unwilling to answer any questions. Obtained name from arresting officer. Two medications were seen by Deputies which were later identified by wife as Nadonol and Flourenif. Inmate had been drinking sometime during the PM.
>> O: breathing hard for 20 mins then breathing became stable. BP assessed: 200/190.
>> A: Alteration in thought processes
>> Alteration in comfort
>> P: To see Dr. O'Riordan in the AM.
>> To see Dr. Oberhelman in the AM.
>> Placed on 15 min suicide watch.

(Def. Richard Doria Mot. Summ. J., Ex. D.) Plaintiff states that he does not recall being asked

any questions and that he did not raise any complaints because he was still unable to speak.

Further, plaintiff asserts that he does not drink any alcoholic beverages because of his

medication. The parties agree that before administering medication, nurses at the jail must

confirm the prescription with the inmate's doctor and/or pharmacy. In addition, the nurses need

an order from the jail physician to administer medication.

At 11:35 p.m., Nurse Sheilah Clark, LPN ("Nurse Clark") evaluated plaintiff to determine

whether he needed to remain on suicide watch. During her evaluation, plaintiff told her that he

needed to take his "heart medication" and that he was born with a cardiac problem. Nurse Clark

took plaintiff's vital signs. His blood pressure was 160/100 and his temperature and pulse were

both normal. She detected the smell of alcohol on plaintiff. Nurse Clark assessed plaintiff 35

minutes later, at 12:10 a.m., and pursuant to Dr. O'Riordan's verbal order kept plaintiff on

suicide watch. She determined that based on plaintiff's vital signs, and the lowering of his blood

pressure from a prior reading, plaintiff had become less agitated and was settling down.

At 11:30 a.m. the next morning, October 17, Nurse Regina Robinson ("Nurse Robinson") evaluated plaintiff and he complained to her that he was experiencing "chest pain." She telephoned Dr. Oberhelman and he ordered that plaintiff be administered 50 mg. of Tenormin (a blood pressure medication). Plaintiff asserts that he never took the Tenormin because it fell out of his mouth and he was unable to retrieve it. At 1:00 p.m., Dr. O'Riordan, the CMS psychologist, saw plaintiff. He kept plaintiff on suicide watch. Plaintiff admits that a doctor came to his cell but states that he was never examined. Plaintiff was released from the jail at 4:15 p.m. after posting bond. The parties are in agreement that during plaintiff's detention, which lasted approximately 20 hours, his blood pressure was checked four times.

After being released, plaintiff went home, and after about one or two hours at home he went to the emergency room at Good Samaritan Hospital. While there, he underwent several x-rays and scans and was released a couple of hours later after the physicians could find nothing wrong with him. He did not receive any additional medical treatment after leaving the hospital, nor did he return to see a physician in three days as recommended in his written discharge orders. Plaintiff testified that the doctors did not find anything wrong with him but they did give him a "a couple of prescriptions . . . for pain or something." (DeGenova Dep. at 107-08.)

After the criminal damage to property complaint against plaintiff was dismissed, plaintiff filed this lawsuit against Stahurski for false arrest and malicious prosecution under Illinois law, against Bertuca for false arrest and deliberate indifference to his medical needs under § 1983, and against the Sheriff for policies of deliberate indifference to his medical needs and unreasonable length of post-arrest detention under § 1983.

# DISCUSSION

## I.  Federal Claims

In order to prevail on a § 1983 claim, a plaintiff must establish that the defendant deprived him of a constitutional or federal right and that the defendant acted under color of state law. *Brokaw* v. *Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000) (citation omitted). Defendants argue that they are entitled to summary judgment on plaintiff's § 1983 claims.

### A.  Bertuca

#### 1.  False Arrest

It is undisputed that plaintiff was arrested pursuant to an arrest warrant issued by a judge upon a finding of probable cause. The general rule is that "[a] plaintiff cannot base a valid Fourth Amendment claim on an arrest made under a valid warrant." *Neiman* v. *Keane*, 232 F.3d 577, 579 (7th Cir. 2000) (citing *Baker* v. *McCollan*, 443 U.S. 137, 143-44 (1979)). Where, however, the officer procuring the warrant knowingly or recklessly withholds facts that could negate probable cause, he may be liable for violating the arrestee's civil rights. *See id.* at 580; *Olson* v. *Tyler*, 825 F.2d 1116, 1118 (7th Cir. 1987). In other words, an officer is immune from suit unless plaintiff shows that the "warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id.* (quoting *Malley* v. *Briggs*, 475 U.S. 335, 344-45 (1986)). Plaintiff asserts that Bertuca made a materially false statement to the judge when he represented in the criminal complaint (which was used as the basis for the warrant) that plaintiff had "damaged property of Robert J. Stahurski, the lawn in front of [Stahurski's] residence" because the damage was really to the County's, and not Stahurski's, property. (*See*

Pl.'s Mem. in Opp. at 8.)  Even assuming the damage was to County property,[3] plaintiff has

submitted no evidence that Bertuca intentionally failed to bring this fact to the attention of the

warrant-issuing judge.  There is no evidence that at the time Bertuca drafted the complaint, which

was shortly after he responded to the call at Stahurski's home and personally observed the

damage to the lawn, that Bertuca knew or even should have known that Stahurski did not own

the damaged property.[4]  Therefore, Bertuca is entitled to summary judgment on the basis of the

arrest warrant.

    In any event, the record shows that Bertuca had probable cause to arrest plaintiff.  "An

essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause."

*Kelley* v. *Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (citation omitted).  Probable cause exists when

the facts and circumstances of which an officer has reasonably trustworthy information would

lead a prudent person to believe that a suspect had committed or was committing an offense.  *Id.*

(quotation omitted); *Neiman*, 232 F.3d at 580.  Although probable cause is usually a jury

question, the court may decide the issue "when there is no room for a difference of opinion

---

[3]Whether the property was County property rather than Stahurski's property is a disputed issue.  Plaintiff attempts to prove this point by submitting a copy of a subdivision plat assessment identifying a 66-foot wide public way, and by relying on Stahurski's deposition testimony wherein he testified that his house was approximately 30 feet from the paved road and his property line did not attempt to learn how far from the paved road the public way extended.  (*See* Pl.'s Additional Facts ¶¶ 5a.-d.)  Not only has plaintiff failed to lay a proper foundation for admission of the plat assessment, but plaintiff has also failed to provide an adequate description and/or explanation of the location of the damaged property on the plat assessment to be of assistance to the court in determining ownership of the property.

[4]Indeed, the evidence is to the contrary.  (*See* Bertuca Dep. at 13) ("Q. Are you aware whether or not some of the grass next to the roadway belongs to the County rather than belonging to the homeowner?  A. I wouldn't know that.").  Moreover, because plaintiff's evidence as to whether Stahurski knew the damaged property was County property is unclear (*see* Stahurski Dep. at 49, 51-52) (indicating that although his property line did not extend all the way to the pavement, he did not know where his property line ended and County line began and he thought he was required by the County to maintain the grass in front of his house), it is unreasonable to infer that Bertuca should have known of the precise ownership of the damaged property.

concerning the facts or the reasonable inferences to be drawn from them[.]" *Neiman*, 232 F.3d at

580 (quotation omitted). The test is an objective one and the court evaluates probable cause as

the facts would have appeared "to a reasonable person in the position of the arresting

officer–seeing what he saw, hearing what he heard." *Kelley*, 149 F.3d at 646 (quotation omitted).

The statute under which plaintiff was arrested is the Illinois criminal damage to property statute,

which makes it illegal for a person to "knowingly damage[] any property of another without his

consent[.]" 720 ILCS 5/21-1(1)(a).[5] "In a criminal-damage-to-property prosecution, the State

must prove that the property damaged was that of a person other than the defendant." *People* v.

*Tate*, 87 Ill.2d 134, 429 N.E.2d 460, 478 (Ill. 1981).

The facts and circumstances within Bertuca's knowledge were sufficient to justify the

belief that plaintiff had committed the offense of criminal damage to property of another.

Stahurski called the Sheriff's Office and complained of damage to his property. Bertuca was

dispatched to his house and Stahurski explained to him that he had witnessed plaintiff drive his

car across the grass. Stahurski showed Bertuca ruts in the grass approximately four to five feet

from the paved roadway. Bertuca also questioned plaintiff, who denied damaging Stahurski's

lawn and stated that Stahurski previously damaged his lawn but he did not report it to the police.

"Complaints from putative victims about alleged crimes generally establish probable cause

unless the complaint 'would lead a reasonable officer to be suspicious,'" *Neiman*, 232 F.3d at

581 (quotation omitted), and an officer is entitled to credit one account over another. *See id.* at

580-81; *see also Gramenos* v. *Jewel Cos.*, 797 F.2d 432, 438-39 (7th Cir. 1986). Plaintiff has not

---

[5]The offense is a misdemeanor if the damage does not exceed $300, 720 ILCS 5/21-1(2), as charged in this case. Illinois permits a full custodial arrest based on probable cause for any offense, including misdemeanor offenses. *See* 725 ILCS 5/107-2(1)(c); *Gramenos* v. *Jewel Cos., Inc.*, 797 F.2d 432, 441 (7th Cir. 1986).

pointed to any evidence that the damage was so far removed from Stahurski's property that a reasonable officer would have suspected that Stahurski did not own the property. And although plaintiff told Bertuca he did not damage Stahurski's lawn, he did not challenge the ownership of the property, as he now does. Thus, based on Stahurski's account and what Bertuca observed, Bertuca had reason to conclude that there was a reasonable basis to believe that plaintiff had damaged Stahurski's property. *Cf. Kelley*, 149 F.3d at 646-47 (where manager of restaurant complained that plaintiff was on restaurant property and officers observed plaintiff in restaurant parking lot and adjacent grassy area, officers did not first have to ascertain location of property line from official sources to determine probable cause to arrest for trespass even though plaintiff said she was on a public right-of-way).

Even if the damaged lawn was not Stahurski's property, but was County property, Bertuca had probable cause to arrest plaintiff for criminal damage to government supported property, a nearly identical offense. *See* 720 ILCS 5/21-4(1)(a) (It is a felony to "[k]nowingly damage[] any property supported in whole or in part with State funds, funds of a unit of local government, . . . or Federal funds administered or granted through State agencies without the consent of the State[.]"). Because proof of probable cause to arrest the plaintiff on a closely related charge is a defense to a § 1983 claim, plaintiff's claim also fails. *See Kelley*, 149 F.3d at 647-48 ("[E]ven if probable cause does not exist for the crime charged, proof of probable cause to arrest the plaintiff on a closely related charge is also a defense.") (citation omitted).[6] Therefore, Bertuca is entitled to summary judgment on plaintiff's false arrest claim.

_____

[6]The charging instrument could have been amended to charge plaintiff with the nearly identical crime of criminal damage to government supported property. *See People* v. *Jones*, 53 Ill.2d 460, 292 N.E.2d 361, 363 (Ill. 1973) (Trial court may permit amendment of an indictment prior to trial to reflect the proper identity of the victim.).

2.    Deliberate Indifference to Medical Needs

Next, plaintiff contends that Bertuca was deliberately indifferent to plaintiff's medical needs because on the way to the jail, Bertuca observed that plaintiff had passed out, but notwithstanding the earnest importuning of plaintiff's daughter, refused to take plaintiff to the hospital. An arrestee's claim of deprivation of medical care is governed by the Due Process Clause of the Fourteenth Amendment, and in ruling on the claim, the court applies the standard applicable to the Eighth Amendment, which protects prisoners from deliberate indifference to serious medical needs. *See Chapman* v. *Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (citing *Zentmyer* v. *Kendall County, Illinois*, 220 F.3d 805, 810 (7th Cir. 2000) (quoting *Estelle* v. *Gamble*, 429 U.S. 97, 104 (1976)). In order to prevail on a deliberate indifference claim, a detainee must establish that (1) he had an objectively serious injury or medical need; and (2) the official knew the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it. *Id.* (citation omitted).

Under the first prong, an objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotations omitted). Plaintiff has not established by competent evidence his medical diagnosis.[7] Nevertheless, even assuming his diagnosis and assuming he fainted on the way to the jail (at or near 9:00 p.m.), there is no evidence that his condition was such as to require emergency medical treatment at a hospital, which is what plaintiff contends should have been done. Bertuca checked plaintiff's pulse, breathing and color and determined that plaintiff's was all right. Even if Bertuca was incorrect,

---

[7] *See* discussion *supra* note 2.

13

there is no evidence that treatment at a hospital was the required course of action. The only evidence plaintiff submits for why he should have been taken to a hospital is his daughter's testimony that she requested Bertuca take her father to a doctor. However, Bertuca proceeded to the jail where jail personnel including medical staff met them. Plaintiff was seen by a nurse who determined he was medically acceptable for admission to the jail. Moreover, Nurse Adighibe also testified that when she evaluated plaintiff shortly thereafter at 10:00 p.m., he did not require any immediate medical care from a physician nor did he require transfer to a hospital, and that if she had felt that he required immediate medical care, she had the authority to call a physician for orders or to send him to the hospital. In response to her contention, plaintiff does not contend he needed hospital care, only that he needed his medication. (*See* Pl.'s 56.1(b) Statement ¶ 13.) If he does not contend that he needed hospital care at 10:00 p.m., *after* he had already missed a dose of medication, it is difficult to reasonably infer that he needed to be taken to the hospital an hour earlier, *at or before* his scheduled time to take medication. Finally, he presents no evidence from the test results after he was released that would indicate, or from which one could infer, that emergency medical treatment at a hospital was required during his trip to the jail. *Compare Salazar* v. *City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991) (taking plaintiff to hospital would likely have led to the discovery and treatment of plaintiff's ruptured liver from which he died) *with Williams* v. *Cearlock*, 993 F. Supp. 1192, 1196 (C.D. Ill. 1998) (granting summary judgment reasoning, *inter alia*, that the "court is particularly unwilling to find a constitutional violation since the plaintiff suffered no real harm, and since he has failed to establish that the minor injuries he did suffer can be attributed to the lack of [psychotropic and blood pressure] medication").

Under the second prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Zentmyer*, 220 F.3d at 811. Even though Bertuca saw plaintiff lying down in the back seat of the squad car and was aware of plaintiff's need to take heart medication at 9:00 p.m., there is no evidence that Bertuca was aware of a serious risk that would require medical treatment at a hospital. As set forth, *supra*, he checked plaintiff's condition and determined plaintiff's breathing and color were fine. Bertuca also testified that, at the time, he believed plaintiff was being uncooperative. Plaintiff has not shown that this belief, even if unreasonable, was not honestly held. *Cf. Qian* v. *Kautz*, 168 F.3d 949, 956 (7th Cir. 1999) (affirming summary judgment to defendants on medical deprivation claim where there was no evidence that officials knew of plaintiff's condition – a subdural hematoma requiring an emergency craniotomy – even though the record supported an inference that they should have known. There was nothing to suggest that their belief that plaintiff was still intoxicated after 72 hours, while unreasonable, was not honestly held).

In any event, "[n]either negligence or gross negligence is a sufficient basis for liability; rather, liability attaches only if the conduct is intentional or criminally reckless." *Chapman*, 241 F.3d at 845 (citing *Salazar*, 940 F.2d at 238). "Deliberate indifference can arise by a failure to provide prompt treatment for serious medical needs or by intentionally interfering with treatment once prescribed." *Id.* (citing *Estelle* v. *Gamble*, 429 U.S. 97, 104-05 (1976)). There is no evidence that Bertuca either intentionally or recklessly interfered with plaintiff's medication or failed to take measures commensurate with his needs. Plaintiff cites to *Solomon* v. *English*, No. 92 C 1597, 1994 WL 61794 (N.D. Ill. Feb. 24, 1994), where the court denied a motion to

dismiss finding that plaintiff had stated a claim for deliberate indifference. There a detainee informed the defendant correctional officer of his heart condition and asked for his medication or to be taken to the dispensary. However, defendant refused to do anything at all, even look in on him, and plaintiff thereafter fainted and was taken to the emergency room by other officers. *Id.* at *2. Unlike the officer in *Solomon*, however, instead of doing "nothing," Bertuca permitted plaintiff to take his medication with him to the jail, handcuffed plaintiff in front instead of in the back, pulled over and checked plaintiff's pulse, breathing and color, and radioed ahead to the jail to inform them that he was coming with the subject laying across the back seat. He then proceeded directly to the jail. Upon arrival at the jail, jail personnel including medical staff met them, and he was seen by a nurse. Because Bertuca's actions do not exhibit deliberate indifference, *see Qian*, 168 F.3d at 956, the court grants summary judgment in favor of Bertuca on plaintiff's deliberate indifference claim.

B.    The Sheriff

In order to prevail on a § 1983 claim against the Sheriff, who is sued in his official capacity,[8] plaintiff must establish a deprivation of his constitutional rights and that the

---

[8]Plaintiff sues the Sheriff of DuPage County (Richard P. Doria was the sheriff at the time of the incidents in question) in his official capacity. Claims against government officers in their official capacities are actually claims against the government entity for which they work. *Kentucky* v. *Graham*, 473 U.S. 159, 166-67 (1985). Thus, a suit against the Sheriff of DuPage County in his official capacity is a suit against the Sheriff's Office. Defendant argues, however, that plaintiff cannot sue the Sheriff's Office because it is not a suable entity. As pointed out by plaintiff, though, the Seventh Circuit already held in this case that "the Sheriff's office has a legal existence separate from the county and the State, and is thus a suable entity." *DeGenova* v. *Sheriff of DuPage County*, 209 F.3d 973, 977 n.2 (7th Cir. 2000) (citations omitted). Defendant apparently confuses the Seventh Circuit's recognition that Illinois courts have not yet decided whether a judgment against the Sheriff's Office is collectible (which is a matter of first impression for Illinois courts), *see id.*, with whether the entity is suable. The question of whether a judgment is collectible has been certified to the Illinois Supreme Court. *See Carver* v. *Sheriff of LaSalle County, Illinois*, 243 F.3d 379, 386 (7th Cir. 2001).

16

deprivation was caused by a policy or custom of the Sheriff's Office. *Monell* v. *Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978).

1. Deliberate Indifference to Medical Needs

Plaintiff asserts that, at the jail, he was denied adequate medical care when he did not receive his heart medication that he was supposed to take at 9:00 p.m. on October 16 and 9:00 a.m. on October 17. A detainee's Fourteenth Amendment right not to be punished without due process encompasses the protections against medical mistreatment applicable to Eighth Amendment claims. *See Holmes* v. *Sheahan*, 930 F.2d 1196, 1199 (7th Cir. 1991) (citing, *inter alia*, *Hamm* v. *DeKalb County*, 774 F.2d 1567, 1572-74 (11th Cir. 1985)). The government "has an affirmative duty 'to provide persons in its custody with a medical care system that meets minimal standards of adequacy,'" *id.* (quotation omitted), and the "government's failure to provide medical care . . . is . . . actionable under § 1983 when it evinces 'deliberate indifference to a prisoner's serious illness or injury.'" *Id.* (quoting *Estelle*, 429 U.S. at 105). Plaintiff's claim fails because (apart from whether failure to provide plaintiff with his prescription medication at the times indicated rose to deliberate indifference) plaintiff has not provided any evidence that the failure was the result of a policy or a custom and practice of the Sheriff's Office.

A plaintiff can establish a policy by showing either "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) . . . that the constitutional injury was caused by a person with final policymaking authority." *McTigue* v. *City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal quotation marks omitted). Plaintiff does not argue that the

alleged deprivation occurred as a result of actions of a final policy-maker. Thus, the question is whether plaintiff has submitted sufficient evidence from which to infer that the deprivation was the result of an express policy or a custom and practice of the Sheriff's Office. Plaintiff's response to defendant's motion for summary judgment is largely conclusional in identifying a policy:

> In this case, plaintiff arrived at the DuPage County Jail having a syncotic [sic] episode and unable to speak. Under the regular and ordinary policies of the jail, plaintiff was treated as an intoxicated and uncooperative inmate. Plaintiff was not permitted access to his medication; no attempt was made to confer with a physician about plaintiff's condition until 11:30 a.m. the next day, when a telephone call was placed to Dr. Oberhelman. . . . Under the Sheriff's official policies, even when plaintiff told a nurse (at 11:35 p.m. on October 16, 1996) that 'I have to have my heart medicine,' no action could be taken other than to continue plaintiff on suicide watch. Because of the Sheriff's official policies, plaintiff did not receive the heart medication that he was supposed to take every twelve hours until after he was released.

(Pl.'s Mem. in Opp. at 11.) In his response to defendant's Rule 56.1 statement, which asserts that the medical care of inmates (including preparing and implementing policies and procedures relating thereto) was contracted to CMS (*see* Def. Richard Doria's Rule 56.1(a) Statement ¶¶ 4-5), plaintiff disagreed asserting that the Sheriff's Office has rules that do not allow for the possession of medication by the inmate's personal physician. (*See* Pl.'s 56.1(b) Statement ¶¶ 4-5) (citing Inmate Rules and Regulations at 11). Plaintiff did not attach a copy of the jail rules or even quote from them. Defendant conceded in his reply, however, that plaintiff's medication was taken from him in accordance with official policy of the Sheriff's Office and attached a copy of the Inmate Rules and Regulations, which provide:

> Medical Services are provided by a contracted Correctional Medical Service [CMS] Company . . . . [N]eeds will be met through 24 hour a day coverage by licensed Healthcare staff. [CMS] strives to provide inmates appropriate access to

care, immediate attention for medical emergencies, attention to non-emergency health problems, consistent follow-up for chronic health problems, and patient education. During intake to the DuPage County Jail, you were screened for potential medical problems. If you have conditions requiring immediate attention you will be referred for evaluation by health staff. If you were receiving treatment when admitted to the jail, Healthcare staff will attempt to contact your doctor for information to determine the need to continue treatment. . . . If you have emergency medical problems, inform security staff immediately so medical staff can be alerted. Medication will be provided to you daily as prescribed by the physician. You are responsible to take the medication as prescribed. Medication found on your person may be considered contraband and may result in disciplinary action. Any medication brought with you to the facility will be kept with your property for return to you at release from the jail. . . .

(Def. Richard Doria's Reply Mem., Ex. J.) This policy does not manifest deliberate indifference.

It is supported by the Illinois County Jail Standards, which provide, in part:

Any medication in the possession of a detainee at admission shall be withheld until verification of its proper use is obtained and documented. This verification shall be made as soon as possible, but within the time interval specified for administration of the medication on the prescription container.

20 Ill. Admin. Code § 701.40(j). The policy is consistent with the Illinois County Jail Standards in that the policy provides that if an inmate was "receiving treatment when admitted to the jail, Healthcare staff will attempt to contact your doctor for information to determine the need to continue treatment" and healthcare staff are to attend to conditions requiring immediate treatment. *See Garvin* v. *Armstrong*, 236 F.3d 896, 899 (7th Cir. 2001) (affirming summary judgment holding that jail policy of taking inhalers from inmates was not unconstitutional because it was supported by Illinois County Jail Standards to secure all drugs and make them accessible only to designated staff, and in any event, the jail also had a policy that asthmatics receive their inhalers within four minutes of asking for them). Thus, the policy is not unconstitutional.

Likewise, plaintiff has failed to show that a custom and practice existed of depriving persons, who are "having a syncotic [sic] episode" of medication, treating them as intoxicated and uncooperative and placing them on suicide watch without allowing any other action to be taken other than to keep them on suicide watch. (*See* Pl.'s Mem. in Opp. at 11.) Not only does plaintiff's own evidence indicate that medication could be provided to plaintiff while he was on suicide watch (*see* Pl.'s 56.1(b) Statement ¶¶ 19-20 (conceding that he was prescribed medication after complaining of chest pains to Nurse Robinson on October 17, but noting that the medication fell out of his mouth)), but other than his own case, plaintiff offers no evidence of past incidents of deprivation, and he does not attempt to prove a failure to train or other type of "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Holmes*, 930 F.2d at 1200 (reversing judgment on jury verdict entered against county); *see also Conner* v. *Travis County*, 209 F.3d 794, 797 (5th Cir. 2000) (affirming judgment in favor of county and county sheriff, stating that "if the need for training in this area was 'so obvious' and the failure to train was 'so likely to result in the violation of constitutional rights' . . . [the plaintiffs] would be able to identify other instances of harm arising from the failure to train. The fact that they did not do so undercuts their deliberate indifference claim."); *Rubeck* v. *Sheriff of Wabash County*, 824 F. Supp. 1291, 1300-01 (N.D. Ind. 1993) (granting summary judgment to sheriff in his official capacity because plaintiff failed to present any evidence to support failure to train or other policy claim); *see also Freeman* v. *Fairman*, 916 F. Supp. 786, 790 (N.D. Ill. 1996) (dismissing § 1983 claim against Cook County Sheriff's Department where allegations centered on only a single course of improper medical care); *Solomon*, 1994 WL 61794, at *4 (dismissing § 1983 official capacity

claim where plaintiff did not allege any acts other than his own case "from which one could infer a custom or specific pattern of deliberate indifference").[9] Because plaintiff's claim amounts only to a *respondeat superior* action, it cannot prevail. *McTigue*, 60 F.3d at 382. Therefore, the court grants summary judgment in favor of the Sheriff on plaintiff's deliberate indifference claim.

### 2. Unreasonable Length of Post-Arrest Detention[10]

Plaintiff contends the booking procedure policy at the jail was unconstitutional because it resulted in an unreasonable length of post-arrest detention, namely plaintiff was not permitted to post bond for approximately 20 hours after arriving at the jail, even though his family was ready and willing to post bond. The routine booking procedure at the jail, which plaintiff does not dispute, includes fingerprinting, asking questions pertaining to identity and medical needs, performing a check for outstanding warrants, and inventorying personal property. Plaintiff does not contend that the fact of booking itself is unconstitutional, *see Doe* v. *Sheriff of DuPage County*, 128 F.3d 586, 587 (7th Cir. 1997) ("[T]he 'booking' of an arrestee, which for one thing

---

[9]The cases cited by plaintiff are inapposite because they contained allegations and/or evidence of more than one instance of allegedly deliberate indifference. *See Nelson* v. *Prison Health Servs., Inc.*, 991 F. Supp. 1452, 1464-65 (M.D. Fla. 1997) (denying summary judgment on municipal liability claim for actions of nurses because plaintiff presented evidence that jail had a longstanding history of failing to provide adequate medical care dating back to 1975 and even the director of nursing at the jail characterized the attitude of the nurses at the jail as one of "deliberate indifference"); *Weeks* v. *Benton*, 649 F. Supp. 1297, 1302-03 (S.D. Ala. 1986) (denying motion to dismiss finding that plaintiff had stated a claim against the Sheriff's Office where plaintiff alleged, *inter alia*, that defendant had a custom or policy of inadequate training, supervision and staffing at the jail to meet the medical needs of inmates and pointed to the plaintiff's specific case as well as the defendant's violation of an injunction issued by the court requiring that defendant maintain a specified number of guards at the jail capable of handling inmate emergencies). The one other case is not procedurally on point. *See Mitchell* v. *Aluisi*, 872 F.2d 577, 580-81 (4th Cir. 1989) (Fact record had not been developed due to focus on other legal issues before the trial court, thus appellate court remanded for further factual development regarding inadequate training of medical personnel claim.).

[10]Plaintiff asserts that defendant did not include any argument about plaintiff's post-arrest length of detention claim in its motion for summary judgment and thus argues it is not currently at issue. (*See* Pl.'s Mem. in Opp. at 10.) However, plaintiff overlooks that defendant did move for summary judgment on this claim, but did so in a separate motion from the motion for summary judgment on the medical policy claim. (*See* Defs.' Deputy Bertuca and DuPage Sheriff's Mot. Summ. J. On All Claims Other than the Medical Policy Claims, and Mem. in Support thereof, at 6.)

confirms the person's identity, does not violate the Fourth Amendment[,] . . . even when the arrest is for a minor matter, and even if the arrestee is ready and able to post bail immediately.") (internal citations and quotations omitted), but rather that his Fourteenth Amendment rights were violated because the booking process took too long. Plaintiff argues that

> [a]s the direct and proximate result of the official policies of the Sheriff of DuPage County, jail officials refused to permit plaintiff's family to post cash bond and caused plaintiff to be held in custody until the early evening of October 17, 1996 when plaintiff's family was permitted to post bond

(Pl.'s Mem. in Opp. at 10) (citing Am. Compl. at ¶ 16.) Specifically, plaintiff asserts that it is the policy of the Sheriff to "refuse to permit persons arrested on misdemeanor warrants to post bond if that person, like himself, is having a 'syncotic [sic] episode.'" (Pl.'s 56.1(b) Statement ¶ 31.) The court concludes that (apart from whether the 20-hour detention of a person arrested on a misdemeanor warrant who is having a "syncopic" episode is unconstitutional), plaintiff has failed to put forward any evidence of a policy necessary to hold the Sheriff's Office liable.

Plaintiff does not point to any express policy of the Sheriff's Office providing for such prolonged detention, nor does he argue that jail officials who refused to permit him to post bond were final policy-makers. Thus, the question is whether he has established a custom or practice. He has not. The only evidence he points to are facts surrounding his own detention. He testified that when he arrived at the jail, he was roughly pulled from the car and was unable to speak because he was having trouble breathing; that jail personnel took away his medication in accordance with official policy and made rude comments about his medical needs; that he was dragged to a cell where he was kicked and his clothes were removed; and while he was being held at the jail, his family was attempting to post bond, but jail officials refused to accept bond

that had been set on the warrant because plaintiff "wasn't cooperating." (Pl.'s Additional Facts, ¶¶ 9b.-g.) His daughter, Diane, testified that at the jail she was told by an officer that they were going to have to hold her father because "he wasn't cooperating" and that she responded that Bertuca and the other deputy who had arrested her father had told her that her father would be out "in a few hours." (Diane DeGenova Dep. at 58-59.) This single incident of refusing to permit posting of bond, however, does not constitute a custom or practice.[11] *See Carr* v. *City of Chicago*, No. 85 C 6521, 1989 WL 64722, *2 (N.D. Ill. June 8, 1989) (granting summary judgment to city on § 1983 claim, which asserted an unconstitutional policy of detention, where plaintiff presented "no evidence that the City maintains a policy to detain arrestees for extended periods of time. Nor is there any evidence that the allegedly unlawful detentions are systemic."). Therefore, the Sheriff is entitled to summary judgment on plaintiff's post-arrest detention claim.

## II.   State Claims

Having decided that summary judgment must be granted on plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over the remaining state law false arrest and malicious prosecution claims against defendant Stahurski. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court dismissed all claims over which it has original jurisdiction."); *Groce* v. *Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

---

[11]Because plaintiff has not sued the individual jail officials responsible for his prolonged detention, the court does not consider it necessary to address the question of whether their actions in detaining him for 20 hours is unconstitutional.

## CONCLUSION

For the reasons stated above, the court GRANTS defendant Bertuca's and defendant Sheriff's motions for summary judgment [#44, 46], and declines to rule on defendant Stahurski's motion for summary judgment [#42], instead dismissing the pendent state law claims against him pursuant to 28 U.S.C. § 1367(c)(3).

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: October 30, 2001